Woodrow DAVIS III *v.* STATE of Arkansas

CR 97-562                                             955 S.W.2d 705

Supreme Court of Arkansas
Opinion delivered November 20, 1997

*William R. Simpson, Jr.*, Public Defender, by: *Deborah R. Sallings*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Gil Dudley*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Woodrow Davis, III, was convicted of capital murder for the shooting death of Billy Sanders on January 31, 1995. Although the State sought the death penalty, Davis was sentenced to life imprisonment without parole.

At trial the State introduced a taped conversation made on April 17, 1995, between Davis and an acquaintance, Bobby Tygart. Tygart had suspected Davis's involvement in Sanders's death and had offered to aid law enforcement officers in the investigation of the murder. Unbeknownst to Davis, Tygart was wired when Tygart initiated conversation and successfully obtained Davis's statements implicating himself in Sanders's murder. Also, as a part of the State's case-in-chief, the State introduced into evidence Davis's confession which officers obtained on April 18, 1995.

Davis's only point for reversal on appeal is that the trial court erred in refusing to exclude from evidence five segments from Davis's and Tygart's recorded conversation. Davis's argument is meritless.

In addressing Davis's point, we are met with his general contention that the five segments he sought to exclude at trial had little or no probative value and whatever value they might have had was outweighed by their unfair and undue prejudice. *See* Ark. R. Evid. 403 (1997). Davis also claims the content of the disputed segments had no independent relevance to the State's case and tended only to show him as a bad person. *See* Ark. R. Evid. 404 (1997).

The only meaningful way to examine and understand Davis's argument is to abstract all of his statements made during his conversation with Tygart, but in doing so, we sequentially number and italicize the five passages to which Davis objects:[1]

> What are you doing? Let's go. Come here, boy. Where's your old lady at? Fayetteville? What for? Oh yeah —. (Tygart's aunt is in the hospital in Jacksonville; the aunt's car is messed up, and explains to Davis this is why he got away without his wife.) Oh yeah.
>
> You don't got no dope? No, not, I did some crack. I used a big old rock of crack. Cocaine. Oh, let's go get a rock. No (Davis doesn't have any money), I was going to get twenty from you. I was gonna borrow twenty from you. You! On "E?" (Tygart's gas gauge) Just out runnin' around? He's left town (referring to a man named "Johnny"). Supposed to be headed to Wisconsin.
>
> (Tygart asks where he can get a gun.) (1) *What for? I don't man, what for? To kill somebody. If you kill somebody, book 'em and run.* Talk to old Jim. He may have one. (Jim) Milam. Old Jim, he won't tell nobody. Hasn't got as much power does it? (referring to the car) How's that? It ain't (the same part of the car). Room and board up here at Cecil's house. I'm gonna ask him about y'all's shit. And I'll see if I can borrow twenty dollars from

---

[1] Davis's entire conversation with Tygart was recorded on three tapes, but the trial court excluded a substantial portion of the conversation as being irrelevant.

him. No (Cecil doesn't have a gun). Jim may have one. He had one that I used a time or two but, he was supposed to got rid of it. We can check 'em.

(Davis next gives directions to Tygart)

No. I'd have to go by myself (to talk to Milam; Tygart then remarks he does not want to talk to Milam). Why not? What? (Tygart responds he has a lot on his mind). I do, too. Got it from my old lady. Jim will give me fifty dollars in the morning, but he can't get it until morning 'cause his old lady is there, and that's why I couldn't talk to him. (Jim is) Robert's uncle or his nephew. He's (Robert) out there somewhere — staying —. I ain't seen him — Well, I seen him the other day. I went over there and seen him.

(The next portion of the conversation discusses what Robert's Uncle is in jail for and more directions to Cecil's).

(Tygart and Davis discuss Tygart's requirement of being in Jacksonville by 9:00, and directions once more.)

(2) *I'll pop a mother fucker in the head. (Unintelligible) — Bull shit walks. Mother fucker pay me right. Mother fucker pay me right, I'll pop the mother fucker for ya. But, uh, you can.* Yeah. (Inaudible) have to pay right, huh. (Tygart states he doesn't know if he could shoot a person). (3) *I can. I can. I can.* (Tygart asks if Davis would have bad dreams afterwards). *I hadn't.* I can't tell ya (who he shot). I got fucked up, boy. You know the mother fucker. Who? (Has Tygart figured out? Tygart says Bill.) How do you figure? I didn't say that. You don't know that. I'll go to the penitentiary for life on that. Oh I figured (Unintelligible) that you looked at me (laughing) uh, yeah, Woody did (Unintelligible). Hey, man, fuckin' planned on — paying for a fuckin' (Unintelligible). Somebody else got paid to do it and then couldn't. And never got it done. Never got it done and then I got in on the deal.

Uh, like I say, I got in on the deal, and it took me forever and ever, kept putting it off. Then I — 'Cause I was scopin' him. Uh, I was sitting across the woods every morning and sitting across the road in the woods watching that mother fucker every morning in the mud, rain, cold. Shoot, about four, five or six months before I ever finally got any — Well, what it got down to, the boy that I — we was doing it for said that —. Peoples on

him — that peoples on him, and they said, you know, look, they on me. It's either him or y'all. He said ya'll done know too much, Said either get him, or we're gonna get y'all. No, not you. Me and the guy I did it for.

Me and the guy that was with me that was supposed to do it, I just supposed to do all of the driving and shit. Then when it come down, he didn't have the balls, so I had to do it. Well, shit I got — I didn't get rid of that — I just planned my shit out and screwed around and got by with it. There's a reward out now over it I heard. Don't nobody know but me, the guy that was with me and the guy that had us do it, and you. I ain't gonna say nothing about it again. Fuckin' took forever. Goddamn.

(Tygart then questions Davis about how he felt afterwards.)

(4) *I's real hurt. I had to go get some stuff. I went and got me a gram, phew, the whole half. Yeah (at one time). I's pushing. Pheewwww, boy I was going. Shit. Took me a while, I have — I felt better when I got over it though. It wasn't, wasn't like I thought it was gonna be. I don't think about it. When I think about how the pussy the mother fucker acted about it.* He was scared. Mother fucker went through — Yeah, damn near. He had to of, 'cause you know, Bob told him, hey man, you better come off that shit if you want to live. And he thought he's gonna live and give me all his shit, but he didn't live. I knew what I had to do. Mother fucker with a .357 in your side.

No, he was supposed to have (some dope). No. He bought it. He fuckin' bought an ounce a week or two ounces a week. A kilo or something. Fucking crystal or cocaine, and he pushed it. He bought that a week. He's got all that money stashed in his house. Cause the guy was fuckin' his old lady, she come by and gave —. Well, he don't no more, he's gone. Bill got the dope, and he put it up to his pushers, mainly in Jacksonville, and then they went out, you know. He, he always passes out two or three people —.

That if I didn't kill him, they were going to kill me for not killing him, 'cause I already knew too much. Yeah. And they'd still kill me now if I say anything. Don't nobody know nothing but me, him and him and — the militia — These mother fuckers are worse than the militia. I ain't lying. These mother fuckers are worse than the militia. It's like the Mafia.

(Tygart then explains some trouble he is in.)

(5) *Boy, don't ever fucking say nothing about that shit, 'cause Goddamn, we'd both have to get killed. I ain't lying. I ain't lying. What was really so fucked up about it was the mother fucker was such a pussy about it, 'cause you know, when you got a .357 in your side, you gonna suck his dick if you want — if you want. If you don't —.* It wasn't what there was supposed to be (the money on Sanders). No, not all of it (was spent by Davis buying crack). Crystal, bought the boys some toys and shit.[2]

Davis specifically objected to each numbered segment set out above as follows:

(1) Any reference to "If you kill somebody, book 'em and run" was not probative of any issue involved, showed Davis was nonchalant about killing a person and portrayed him as a bad person.

(2) When referring to "popping" a person for the right money, the statement made no reference to a specific person and was merely a general observation.

(3) In stating he could shoot somebody and it not bother him, it was not probative, but was highly prejudicial.

(4) His statement concerning the taking of drugs to make him feel better after shooting [Billy] did not reflect Davis's state of mind on the day of the incident [murder] and was irrelevant to any issue at trial.

(5) His reference to using a .357 on Billy Sanders added no new information, and the remainder of the statement portrayed Davis as remorseless, which was not an issue in this case.

In reviewing Davis's arguments in light of the full text of his statements to Tygart, we conclude the five disputed passages were highly relevant, and any prejudicial effect they had were clearly outweighed by their probative value. In fact, to remove those segments challenged by Davis would only cause confusion regarding

---

[2] There are seven to eight additional abstract pages containing statements of Davis to Tygart, but those statements were introduced at trial without objection and are unnecessary to recite for purposes of this opinion.

the meaning of the remaining portions of his conversation with Tygart that were introduced without objection.

The importance of the full text of Davis's April 17, 1995, conversation with Tygart is best illustrated because his statements to Tygart corroborate Davis's April 18, 1995, confession. While Davis does not challenge on appeal the trial court's ruling that allowed his confession into evidence, Davis argued at trial that his confession should have been suppressed because it was not voluntarily, knowingly, and intelligently given. In his closing argument to the jury, Davis's counsel argued that Davis's confession resulted from some type of coercion.[3] Moreover, Davis also offered testimony reflecting that Sanders's employer had received a prior death threat on Sanders's life from a man other than Milam, Reeves or Davis, who claimed Sanders had been seeing the man's wife.

Davis's confession very clearly related how he, Robert Reeves, and Reeves's uncle, Jim Milam, killed Sanders. Milam was the one who initiated the plan by contacting Reeves. Milam gave Reeves a 30-30 rifle, but Reeves did not do the "job." Milam then offered money to Reeves and Davis if they would kill Sanders. Davis and Reeves made several morning trips to woods located near Sanders's house, but Reeves still would not shoot Sanders. Davis said that, after Reeves and Davis failed to kill Sanders, Milam threatened them that "it was either Bill (Sanders) or us."

Davis's confession detailed the day of Sanders's murder, setting out how each party participated. Milam furnished a .357 pistol to Davis and Reeves; afterwards Davis and Reeves found Sanders, driving his truck into his employer's car lot on the morning of January 31, 1995. Reeves and Davis got into Sanders's truck and proceeded to drive to a landfill in Pulaski County. Milam drove his vehicle to the landfill to join them, and after Reeves, Davis, and Sanders arrived, Milam shot Sanders in the head while Sanders was still in his truck. Reeves then placed Sanders's truck in gear so it would roll off and submerge into a

---

[3] Davis also argued his due process right was violated because Tygart had been provided some compensation or reward for his cooperation. However, Tygart had received no compensation or reward at the time of trial.

water hole. Davis and Reeves had taken Sanders's ring and $300.00 in cash. Davis said the cash was split equally between him, Reeves and Milam, but Davis's wife's stepfather later pawned the ring.

In sum, Davis argues the five disputed segments prejudicially placed before the jury evidence and general observations that had no relevance to any issue at trial. Those segments considered along with Davis's confession show Davis's part in Sanders's murder and that Davis's statements to Tygart related to his past participation in that murder. As far as Davis's expressed concern that his mention of a .357 pistol to Tygart added nothing new to the State's case, the State was not limited in the amount of proof it could introduce to prove its case. Instead, the rule is that relevant evidence may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. Ark. R. Evid. 403. Here, considering the record before us, we are unable to say the trial court abused its discretion in rejecting Davis's argument that the probative value of the State's evidence was outweighed by danger of unfair prejudice or needless cumulative evidence. Again, to the contrary, we believe the jury likely would have been confused or misled if the five segments objected to had been excluded from evidence.

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record has been examined in its entirety, and no other rulings adverse to Mr. Davis involving prejudicial error were found. We affirm.